090447 Ramon Lacki, appellant, cross-appellee by David Hurst v. Hendrick and Stephanie Garinger, appellees cross-appellants by Raymond Grecias. Mr. Hurst. Thank you. Good morning. Good morning. Good morning. Mr. Grecias, may it please the court. To decide whether the Equine Liability Act applies, the court must define the relationship between the plaintiff and the horse that hurt her. And in this case, that's where the trial court erred. That's where it made its mistake. Either it didn't define the relationship at all, or it didn't define it properly. We read in conjunction, sections 10 and sections 15 of the Equine Liability Act require that a plaintiff be a participant engaged in an equine activity. There's three components to that. You've got to be a participant, you've got to be engaged, and you've got to be involved in an equine. What was the illness you referred? This is a case where the plaintiff was a monkey with a stall. She was playing horse stall. She was playing horse stall. You got it. In an arena, she was in very close proximity to two other horses, Wrangler and Tego. When the horse had injured her, Danny was brought to the arena by a third party. There's no evidence that she even knew Danny was in her proximity. Danny came to her. She had absolutely no control over Danny whatsoever. And the horse rared up and kicked her. The other aspect of the Equine Liability Act is that a participant must engage in boarding horses. Those are two defined instances in the Act when the Act applies. So, three components. Participate, engage, and one of the enumerated acts. The appellate court has considered the Equine Liability Act on four occasions. I don't believe this appellate court has ever considered the Act. The cases are cited in the brief. It's been considered by the Fifth District in 2005 in the Smith case, the Second District in 2003 by the Cush case, and the First District has considered it twice in 1999 in the Carl and Lessman case. The Smith and the Carl cases are the two that we've highlighted that we think are the most instructive. And both of these cases show that for a plaintiff to be engaged in an equine activity, she has to exert some level of control over the animal that hurts her. It's simply not sufficient that she be engaged in any activity involving a horse. If that's the case, you'd have a very broad Act. It would be very simple to draft the Act, and it would have sweeping scope. And remember, this is a case or an Act that's in derogation of the common law. The common law says you can bring negligence claims for a whole variety of things, including injuries arising from a horse. This Act restricts liability in certain very narrow circumstances, so it's got to be strictly construed. So if, you know, under your interpretation of the Act, let's say you're racing a horse, and you fall off your horse, and you get stepped on by the horse behind you, the Equine Liability Act wouldn't apply to that? It would apply, Judge, because you're a participant in an activity, clearly. You are in control of the horse. But not the horse in any way? Well, perhaps, perhaps not. But you have the control over that circumstance, and that's very different from the facts that are at issue in this case. Ramona didn't have control over any aspect of the horse that hit her, or that kicked her, and probably didn't even know that it was in the ring. And I'll give you another example. The Fifth District Appellate Court in the Smith case held that a passenger in a horse-drawn carriage was not a participant under the Equine Liability Act. Therefore, she wasn't barred from maintaining her common law claims against the owner. But wasn't the reason that she had these two horses in that arena was as a training exercise for the horse that did kick her? I mean, isn't it? She was told, you know, to take the two horses there because they were going to be training this day, and they wanted these horses in there stalled because it would somehow calm the other horse down or something. Isn't that part of...? I believe that may have been the reason that Miss Varenk, who is the owner of this stable or one of the owners of this stable, had those two horses there. This arose in the context of Miss Varenk exhibiting for sale the horse that ultimately injured the plaintiff, whose employee of a vet clinic was operating on the premises. It wasn't the plaintiff's desire or intention to sell the horses. It wasn't her horse to sell. She had no involvement in marketing, exhibiting, or doing anything involving getting those horses. She was picking up, cleaning the stable. I mean, that was the extent of her involvement. I think subsequently she may have learned why those horses were there, and I think, to your point, you're correct. I think those horses, Wrangler and Tego, were there to exert a calming influence on Danny. It evidently didn't work. But she didn't bring those horses there? I mean, I thought that she actually brought them. I'm not sure if she brought them into or not. I believe it may be alleged in the complaint that she did. I just don't recall. I don't know that that's determinative of whether or not the act applies, so I haven't really focused on that. Again, if one of those horses had been the horse that injured her, she's in close proximity to him. But, I mean, wouldn't it be reasonable to say that if those horses are being used in this training exercise, that it's all one training exercise? I mean, if they're using these two horses to have an effect on the behavior of the horse that is being worked or trained, it's sort of like having a whip or some other instrument that you're using to work with Danny. And if she brought them in, I don't know how you say that she isn't participating. I might agree with you if she were part of that plan to sell the horse. Her involvement was very limited. Her involvement was, again, cleaning the stall. She was not part of this plan to exhibit and market and sell this horse. That was being carried out by the defendant, the Varinks. Actually, the defendant, not the Varinks, the Garingers. And then the Varinks, who were the owners and operators of the facility. That was their plan. Ramona's involvement in that was purely secondary. I mean, she was there to perform a function. If anything, her status is really that of an innocent bystander. Her status isn't that of being a participant in doing anything involving marketing, sale, or exhibition of a horse. Well, she's not in marketing or sale of a horse to be engaging in equine activity. I think there are a lot of things, at least according to the Act, that might be engaging in equine activity. There are six enumerated activities that the drafters of the statute list as being involved in equine activity. But that's not the test, Judge. It's not that you'd be involved in equine activity. It's that you'd be a participant engaged in an equine activity. And I'll tell you. Do admit she was engaged with two of the horses. She was, yes, engaged with Rangler and Tico. But she was in an area where at least one of the horses was, and she apparently let that horse sneak up on her. Well, I would disagree with the way you framed that. I don't think she let anything sneak up on her. I think if a horse comes in your proximity, it comes within your proximity. There's no indication that she put that horse in the arena or that she had any knowledge that it was there or what its proximity was to her. Mr. Hurst, is there a difference between having control and exercising control? Well, if there is, I haven't contemplated it. I don't think she had or exercised any control over the horse that kicked her. There's simply no indication of that, and I think it's conceded in the appellee's brief. If there were three horses that are involved here and she was in the arena and she was working with two of them and the third one was there, presumably she had control over that horse. Which one are you referring to? Danny. I can't imagine how. If you don't know that the horse is in your proximity or your presence, I don't know how you can exercise control over him. And there's a couple of other cases that illustrate this point. The Cush case illustrates it and the Carl case illustrates it. Both of those cases are cases where horses passed on a trail and you had a rider on a horse who's involved in a horseback riding activity in control of their horse. No question in both of those cases that they're involved. In one case the rider was passing a horse as part of a group ride, and in the other case the two horses met and crossed. In both cases the horses reared up, kicked, and broke the leg of the plaintiff. In both of those cases the plaintiff's, in one case it was a motion to dismiss, in another case it was a summary judgment. The courts reversed both of those and said, you know what, the Act doesn't apply to those things because the horse that hurts you, the horse that injured you, is not the horse that you were in control of. And it keeps coming back to that. How do you not know that there's a horse in your proximity? We're not talking about a deer tick, we're talking about a horse. How do you not know that a horse is in your proximity? Well, I think if you're cleaning the stall or you're engaged in some activity and a horse comes up behind you, Judge, they move pretty quick. Could she have closed the door to the stall? I don't know. I haven't been to the facility. I don't know what the arrangement was. If it were Ramona that was in control of Danny, that had put Danny in there, she might be charged with knowledge. I guess your argument goes to sort of the zone of danger issue. I think she would have known perhaps that she was in that zone of danger. But she's focused on the two horses that are in her immediate proximity. But I think this goes to justice with Dave's question. I mean, she could have closed that area off when she went in there. In other words, she could have exercised the control over Danny that she had the power to do to exclude Danny from that area where she was going to clean the stall. So she had the power and the right to do that. She just didn't do it. She didn't exercise that power that she had. I think, candidly, I think that's pure speculation about all the potential things she could have done to have secured the arena, if you want to refer to it that way. Could she have put a chain and a padlock on the door? Oh, maybe. Is that reasonable? I don't think so. And I think it presumes that she has some reason to expect that that horse is going to be put in there in the first place with her. And there's no indication in any of the testimony or the record that she had any expectation that the horse was going to be near her or in her proximity at that time. There's just simply no indication of that. Mr. Hirst, there's another portion of your argument that I'm struggling with a little bit. You seem to be arguing that even though the plaintiff was an employee of somebody who was doing boarding services and she was doing what she was instructed to do with regard to those boarding services, that somehow she's not a participant in them. Could you explain to me how you get there? Sure. Here's how you get there. I think there are four reasons why she wasn't engaged in boarding horses sort of by extension or by association. One is that it wasn't the horse boarding activity that gave rise to her injuries. It was the intent to exhibit and sell and prepare this horse for sale that Laura— Well, they were doing that because the horse was boarded, right? And the people wanted to sell the boarded horse. I think people could have taken the horse to a horse auction and sold it any number of ways. I don't know that it was being sold there because it was boarded there. It just simply happened to be an activity that the owner undertook on behalf of the Garingers. Secondly, I don't think it's fair to connect her with that because Ramona had no interaction with the horse. Again, she was unable to guard against this injury. Third, she was an employee of a veterinary clinic. She wasn't providing any kind of veterinary care to the horse. That's one of the enumerated provisions under the Act. She wasn't doing that. She was cleaning up after other horses that had nothing to do with the horse that hurt her. Wasn't the boarding facility part of the veterinary practice? It was all Silvercrest, right? We contend that they're separate. The testimony on that is conflicting. We took the deposition of Laura Garing. I believe she testified at one point in the deposition that she was an employee. Another time she testified she wasn't. There was a break. She had a chance to talk to her attorney between that testimony. If anything, I think her testimony on that is impeaching. Go ahead. Wasn't that issue already resolved in the prior case? Certainly this court has spoken to that issue. It is addressed in the other case. I believe this court indicated that it thought it was clear from the record that only one business was being conducted. That's a determination that perhaps this court has made before. I'll change it. Thank you. You're giving us a third and a fourth reason? Yes, the fourth reason. Perhaps I hit on this. It was the defendant's agent who placed the horse in the arena for their purposes, not the plaintiff. There was no purpose of the plaintiff that was being advanced through exhibition of this horse. The plaintiff was performing simply a task at the insistence of her employer, not advancing the purpose of selling the horse. Well, but if the employer doesn't have horses in his arena, your client doesn't have a job, right? I mean, let's say that she had to have a direct benefit from it. There's not the point she was engaged in this activity because her employer was engaged in it and therefore she had work to do. She certainly had work to do to clean up after the horses, but she wasn't cleaning up after Danny. And the reason or the purpose that Danny was in that arena had nothing to do with the thing that gave rise to the injury. And the reason Danny was in the arena has nothing to do with why your client didn't kick, right? I mean, why the horse was there is just a non-issue, isn't it? It was there. It's not like the horse kicked the client because it was mad it was getting sold. The horse was just there. The issue, again, is did my client exercise any control over that horse? I don't know that the why is there. I mean, you could have been there for grooming purposes. I don't know that the why is there matters, but the point is— Or it could have been for veterinary services. It very well could have been. It doesn't matter. I don't know that that issue matters so much as whether or not my client had some, some level of control over that horse. And she had none. She had absolutely no control over the animal that injured her. And under Section 10 of the Act, the appellate courts have spoken to this. In fact, the Smith court said Section 10 of the Act only has meaning if the participant has some ability to control the equine activity. Thank you. Thank you, Mr. Hurst. Mr. Fabricius. Thank you. Good morning. Good morning. Please, Mr. Court, Mr. Hurst. I am going to invite questions. I came prepared thinking that I really didn't have a lot to say. And without trying to sound like too much, I'm trying to be a kiss-butt here. I just have to adapt to Justice Smith's questions. And I agree. I don't know—I don't know how the plaintiff can have a cause of action here. I don't—I don't agree with Plaintiff's Counsel that the plaintiff has to have some control over the animal for the act to apply. I submit that's the Animal Control Act. This was a dog situation where if the Equine Liability Act didn't apply, maybe that would be an issue. But the Equine Liability Act doesn't look at the issue of control by the injured person over the animal. The Equine Liability Act looks at the activity, whether or not the plaintiff is a participant, whether this is an equine activity, and whether the plaintiff is engaged in that equine activity. And to say that this only applies when the individual has control over the animal, to me, defies logic. The example—and Counsel made a comment that, well, my client wasn't—or that the plaintiff wasn't involved in the sale of the horse. It's—another example would be that, well, if the plaintiff was cleaning a horse stall, and the horse came—and the horse that goes in that stall came by, and it happened to be a racehorse, but the plaintiff was only hired to be a laborer to clean out the horse stall, that the plaintiff would be able to say, well, I'm not involved in racehorses, so I'm not involved and engaged in an equine—or I don't have control over that animal, so I get to sue. The Equine—the act clearly provides that boarding activities is—that the act applies to protect individuals under that circumstance. Another example I have is, what if the plaintiff was cleaning the horse arena? It didn't have anything to do with any horse in particular. It was just cleaning the arena, and there happened to be horses in the arena at the time, and a horse came up and kicked the plaintiff and injured—somehow or another, the plaintiff got injured. Under Plaintiff's Counsel's argument, she'd be able to sue because she didn't have any control over the particular animal that caused the injury. And I submit that's not what the analysis is. The analysis is simply, was this an equine activity, and was the plaintiff a participant in that activity? And she was. I don't think it's disputed. And, Justice O'Brien, just to address a couple of things that I think Your Honor asked. In the complaint, it is alleged that at the time of the incident, the plaintiff was engaged in cleaning the two horse stalls, and that the defendant, or who was then, I guess, then a defendant, Laura Baring, asked her to move these two horses into the horse stall because it was believed by Ms. Baring that the horses would calm down Danny, and there was a reason for that. So, I know this is a 2615 motion, and that it wasn't leading me to get into any discovery or anything, but I submit that we take the pleadings as alleged in the complaint. And in the complaint, it's alleged that the plaintiff was engaged in moving two horses, in cleaning out horse stalls, and was going to move, or was moving two horses to assist in the sale of Danny. Again, I don't think that that's relevant inquiry here. It's just she's involved in boarding horses. Now, in preparing for today, because I didn't have a lot to say, if anybody has any questions, I actually got off on a sidetrack, and I don't know if it's going to become a concern to this panel when you're making your decision, but the Cush case actually raises the issue of whether or not the act applies only to sponsors and professionals. And I actually came prepared today in case that was addressed, that it hasn't been raised by the plaintiff. But in Cush, the ruling, the court actually, I assume the contrary to what counsel has said, that the court didn't make the ruling based on the act itself, saying that the act didn't apply to the activity. What the Cush case held was that the act was that clear, and because it wasn't clear, that it only applies to sponsors and professionals and doesn't apply to simple owners of the horses. And I'm afraid I won't be the king of words by bringing it up, but I actually have researched it, and if you look at the act, it's set forth in the act at section 15, could have been better worded. It has, it addresses the exceptions of 20 only pertaining to professionals and sponsors, and it doesn't say in any other person. However, in section 20, which sets out the exceptions, it does say that the exceptions to protection of the liability act apply to professional sponsors and any other person. And when you read the act in its entirety, it has, the first pair of sections, section 5 has, for the purpose of the act, it provides that delineating the responsibilities of those involved in requiring activities. And I submit the act as intended, and I don't want to, I don't know how far to go with this because it's not an issue that was raised, but I came prepared to actually address, if the panel has any questions as to whether or not this act applies to my client, or my clients, I believe it does. And again, I'm hesitant to go any further because I don't, it's not an issue and I just came prepared to address it. Because they would be any other person. Correct, correct. In one paragraph, and what the second district in the Cush case, with all due respect, got hung up on was in section 15, it only refers to professionals and sponsors, and it doesn't mention any other person. But then in section 20, it refers to professionals, sponsors, and any other person. In reading the statute, it appears clear that the Illinois legislature in enacting the statute simply, in section 15, did not include, it appears to be a Scrivener's error. And actually what I did, I researched other states, and it appears that all, you know, I've never served in the legislature, I've never had anything to do with the state government, I have no clue how it works, but it appears what happened is, or what happens is, one state will adopt the statute, and then other states will simply think it's a good idea and they'll just start adopting it. And Michigan and Tennessee and Illinois, their statutes are all almost identical, and it looks like somebody, when they were typing the Illinois statute, just left out three words. So, I'm not going to go any further than that because, again, I didn't know if it was going to be an issue. The other thing, I'm also cross-staff aligned on the 103B issue. There was a motion to dismiss on behalf of Stephanie Gerringer. My comments will be brief. I submit this, the 3rd District District Court recently ruled in their, I think it's a Verblow case, Verblow, as to what is a reasonable period of time for obtaining service or process. This case was filed, I believe it was in September of 2007. A summons was issued at that time, and it came back nonreturned in October of 2007 as to Stephanie, and on the summons it indicated that she was away at school. And I believe what happened in this case was the litigation was proceeding as to Patrick Gerringer, and plaintiff's counsel simply forgot or just thought it wasn't necessary to do anything as to Stephanie, and the case sat in service or process as to her staff until July. There was an interrogatory sent out to Patrick Gerringer asking for Stephanie's address. That interrogatory was never answered. In July, there was another summons issued, and I submit what happened was that this case had previously been brought up on appeal, and I filed a motion that it wasn't timely because Stephanie Gerringer hadn't been made a defendant yet, and the previous ruling as to Patrick wasn't a final and appealable order. At that time, there was an alias summons issued, and Stephanie Gerringer was served at the exact same spot. The service had been attempted in October of 2007. My position is simply that it's much too long, and it's not reasonable diligence, and the entire case was delayed because of the length of time that it took to get Stephanie served. So I believe the 103B motion should have been granted, and that Stephanie should be out for that reason as well. However, I think that's a secondary issue, and because of the Equine Liability Act, that the entire lawsuit should be dismissed for that reason, or that the trial court should be affirmed for that reason. Unless there's anything else I'm done, I'm sorry for baffling you. I was trying to make it look like I had a lot to say, and I didn't. Thank you. Thank you. Mr. Hurst, rebuttal. The appellee has framed the inquiry as, was this an equine activity, and was she engaged in the activity? He cites that, or he frames that without any citation to authority for his position, and the reason is, if that were the inquiry, then the courts in Smith, Cush, and Carl would have all reached the opposite result. If this were simply the question, is it an equine liability, and is she engaged in an activity, then certainly someone who hops on a horse and goes down a riding trail and gets kicked by another horse, they're engaged in an equine activity. They were injured, you know, by an equine. If that were it, if that were the end of the discussion, could there be a different outcome in those cases? And what's going on in the case law, all of it consistently, is that you have to have some control over the horse that injures you. There was a brief mention made of the 103B motion that has been filed. In their cross appeal, the defendant indicates or makes the statement that it's on page 5 of their brief. He says, it's never been contended that the defendant, Stephanie Garinger, during the period of time in question did not live with her father, the co-defendant. Now, there have been three lawyers that have defended this case through its various progressions. Mr. Fabricius is the third. I would submit that's an inaccurate statement. The father of the defendant, Mr. Garinger, indicated to the deputy who tried to serve her that his daughter was away at school, and so abode service was evidently not effective at that point. Isn't that the classic kind where you substitute service? She lives here, but she's not here right now? I think it should. And I don't think it's appropriate for the defendant to tell the sheriff whether or not service is effective. But in this case, that seems to be what happened. I wrote to counsel on February 14th. That occurred. By the way, the summons, I tried to serve it on October 11th. It was returned. I wrote and sent correspondence on February 14th. I asked for the location of the defendant. I asked him to waive service. I didn't get a response. I wrote again on March 24th. I didn't get a response to the interrogatories or my second letter. We had an alias issued on July 15th. The alias was granted on July 21st. On August 9th, substitute service was again effected. On September 12th, she was served by the Polk County Sheriff in Iowa, so she'd been served twice at that point, maybe three times. The question is, have there been diligent attempts on behalf of the plaintiff? You bet. And that's why the trial court in this case denied their 103B motion and went to the merits. Finally, the appellee spends a little time talking about the statute itself.  Sections 10 and 15 fail to identify what actions fall under the Act, and unfortunately this court, I'm afraid, is tasked with the difficult prospect of trying to ascertain what the term participant and what the term equine activity are. And if you refer to the statute, you will quickly discover that those terms are used as part of their own definitions in sections 10A, 10C, and 10G, as well as section 15. It ends up being circular, and this is precisely the issue that was dealt with in the Carl case. It was acknowledged by them. It was also acknowledged, well, sections 15 and 20 were the problem with the Bush case. And in Smith, again, it came back to Smith referred to it as inartful drafting. Cush went so far as to refer to it as nonsense. One of the courts invited the legislature, and it was Cush, to fix and clarify the scope of the various sections. There are some real problems with the way this statute is drafted, and that's why I've spent the time focusing on and arguing what the two cases that really interpret these sections of the statute, what they mean. Because if you refer simply to the statute or try and understand the statute, I submit that this court is likely to reach the same conclusion that the 5th District, the 2nd District, and the 1st District have all reached, and that is that the statute is very difficult to interpret in a way that isn't internally inconsistent, and the definitions aren't circular. And if that's the case, then I think you'll look at what those courts have done, and they have consistently found that there's got to be some connection between the horse, the injury, and some level of control. And again, it comes back to being a passenger in a carriage or being kicked by a passing horse that you're not in control of. If you don't have some level of control over the horse, and in this case the plaintiff didn't have any control over Danny, Danny came to her and kicked her. She probably didn't even know that Danny was in the arena. If there isn't some level of control, then the act doesn't apply, and the defendant in this case can enjoy the protection of the act. Thank you. Any questions? Thank you, Mr. Harrison. We thank both of you for your arguments this morning. We'll take this matter under advisement, and we'll issue a written decision as quickly as possible.